## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

TERI L. STEINBORN,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　　　　)　　　CAUSE NO. 3:16-cv-00733-MGG
　　　　　　　　　　　　　　　　　　　　)
NANCY A. BERRYHILL, Acting　　　　　)
Commissioner of Social Security,　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　Defendant.　　　　　　　　　　　)

### OPINION AND ORDER

Plaintiff, Teri L. Steinborn, appeals the Social Security Administration's ("SSA's") decision to deny her application for Social Security disability benefits. An administrative law judge ("ALJ") found that Steinborn was not disabled within the meaning of the Social Security Act. The ALJ specifically found that no disability listing had been met and that Steinborn was capable of performing light work as defined in 20 C.F.R. § 404.1567(b). This Court may enter a ruling on this matter based upon the parties' consent. 28 U.S.C. § 636(c); 42 U.S.C. § 405(g); [DE 11]. For the reasons set forth below, the decision of the Commissioner is **REVERSED** and this case is **REMANDED** to the Social Security Administration for further proceedings consistent with this opinion.

### I.　PROCEDURE

On October 29, 2012, Steinborn filed an application for Disability Insurance Benefits ("DIB") with the SSA pursuant to 42 U.S.C. § 423. Steinborn alleges a disability date of February 20, 2012. The SSA denied Steinborn's claims initially and on reconsideration. Steinborn then testified at an administrative hearing before an ALJ in November 2014. Steinborn

was represented by an attorney at the hearing. In March 2015, the ALJ issued a finding that Steinborn had not been disabled since her alleged onset date of February 20, 2012. On June 24, 2016, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Steinborn's request for review. *See Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005); 20 C.F.R. § 404.981. With all administrative remedies exhausted, Steinborn seeks judicial review under 42 U.S.C. §405(g).

## II.    FACTS

Steinborn was born on December 13, 1961, making her over the age of fifty at the time of her benefit application. Steinborn has a limited education and has a demonstrated past work history that included employment as a paralegal, credit analyst, and a supervisor for loans and credit. The ALJ also found that despite a short attempt at waitressing during the relevant period, Steinborn had not engaged in any substantial gainful activity since the alleged onset date.

### A.    Relevant Medical Evidence

#### 1.    Physical Impairments

As part of her application for disability benefits, Steinborn alleged several physical impairments including cervical spine issues that caused lower back pain, tingling in her hands, and ongoing migraine headaches. Dr. David Miller treated Steinborn for her lower back pain and prescribed both physical therapy and OxyContin.  An MRI conducted in 2011 revealed a small central disc protrusion, and by September of that year she sought treatment from orthopedist, Dr. Henry DeLeeuw. Initially, Dr. DeLeeuw scheduled Steinborn for an anterior lumbar interbody fusion that was cancelled when her insurance company later denied coverage for the procedure.

During this time, Steinborn was also treated with Toradol[1] injections for her migraines after various other medications failed.

Steinborn was also placed into a physical therapy program. By April 2012, however, Steinborn stopped going to physical therapy due to her pain. Steinborn reported to Dr. Miller that she was in constant pain, and that she had trouble sleeping and remaining in one position. Another MRI, in December 2012, showed slight progressing disc disease, and further leg raise testing demonstrated that she had a restricted range of motion.

After her DIB application was filed on October 29, 2012, Steinborn underwent an SSA consultative examination by Dr. Mutena Kormun in January 2013. Dr. Kormun found range of motion loss to Steinborn's upper extremities and a grip strength reading of 4/5, as well as a reduced range of motion to her thoracic and lumbar spine. Steinborn reported to Dr. Kormun that she suffered migraine headaches between two and three times per week.

Throughout 2013, Steinborn complained to Dr. Miller of ongoing radicular and sacroiliac joint pain—and a sacroiliac joint injection provided limited relief. Steinborn also continued to see Dr. DeLeeuw for treatment of ongoing back and left shoulder pain. Another MRI conducted in February 2014 showed a labral tear in the shoulder and a disc protrusion. In April 2014, Steinborn underwent an anterior lumbar interbody fusion at discs L4-5. After the procedure, Steinborn still complained of left shoulder pain and continued to see Dr. DeLeeuw for her ongoing chronic back pain. She reported to Dr. DeLeeuw that she had difficulty standing up and walking, and reported an episode of falling down. Another MRI revealed disc protrusions and hypertrophy at discs L3-S1. Dr. DeLeeuw submitted a Residual Function Capacity ("RFC") as

---

[1] Toradol is a nonsteroidal anti-inflammatory drug used for the short-term treatment of moderate to severe pain in adults. *Toradol Tablet*, WEBMD, https://www.webmd.com/drugs/2/drug-57954/toradol-oral/details (last visited March 29, 2018).

part of the record before the ALJ opining that Steinborn could sit more than six hours, stand/walk about an hour before needing to sit, and stand three hours collectively in an eight-hour work day.

## 2.      Mental Impairments

In addition to her physical impairments, Steinborn also alleged several mental impairments in her DIB application. Steinborn was treated by psychiatrist Dr. Anand Popli as early as 2010. In 2012, she reported to Dr. Popli that she generally felt down with decreased energy. Dr. Popli found that Steinborn was suffering from bipolar disorder and attention deficit disorder ("ADD"). Dr. Popli's records then show Steinborn underwent several ups and downs during treatment of her bipolar disorder. In June 2012 she was reported as being stable, yet by September she once again had decreased motivation and did not even want to leave bed. At this time her Patient Health Questionaire-9 ("PHQ-9") score[2] was an 18, prompting Dr. Popli to increase her medication dosage. During the months that followed, Steinborn continued to report a lack of motivation, depression, and that she did not want to leave the house.

Overlapping with Dr. Popli's treatment, Steinborn also sought treatment from Dr. Thomas Allen, Psy. D for family and marriage counseling. Dr. Allen reported that Steinborn was suffering from major depressive disorder ("depression") and post-traumatic stress disorder ("PTSD"). In early 2013, Steinborn reported gaining 22 pounds, and her PHQ-9 score was now a 10—an improvement. In April 2013, however, her score worsened, moving up to a 14. Steinborn once again reported decreased motivation. During this time, Steinborn also reported that she remained in bed most days and did not cook, clean, or shower. She continued to report regular

---

[2] The PHQ-9 monitors a patient's depression during their treatment. Higher scores denote a worsening condition, whereas lower scores correspond to positive treatment results. *See generally* Bernd Lowe et al., *Monitoring Depression Treatment Outcomes with the Patient Health Questionaire-9*, 42 Medical Care 1194–1201 (2004).

migraine headaches. Dr. Allen, in June, continued to treat Steinborn for depression and PTSD. In July, he reported that Steinborn had pressured speech, tangential thoughts, and grandiose ideas regarding building a jewelry shop and a boys and girls club. Dr. Allen also reported that she had difficulty maintaining focus at this appointment and appeared hyperactive and fidgety. At this time, she had a Global Assessment of Functioning ("GAF") score of 70.[3] Two weeks after this appointment, she again had pressured speech, difficulty focusing, and tangential thoughts—as well as expansive affect. Again the following week she exhibited these symptoms, as well as anxiety. These symptoms continued, and in September, she was late to her appointment and reported being sad all the time. Additionally, Dr. Allen noted that Steinborn was anxious, had a tense affect, and was depressed and tearful during the examination. In an October session she was at first cheerful and then became angry. During this session she reported worsening marital problems.

In November 2014, both Dr. Popli and Dr. Allen completed Medical Source Statements opining that Steinborn was disabled due to her mental impairments.

### B.    Relevant Hearing Testimony

On November 26, 2014, Steinborn appeared and testified before the ALJ at a hearing. At the time of the hearing, Steinborn was separated from her husband. Steinborn testified that she had attempted to work as a waitress at a country club, but that she could not carry trays, leading to her hours being cut back. She further testified that she had a dispute with her manager after a country club member complained about her service, and she was subsequently fired.

---

[3] Prior to the publication of the *Diagnostic and Statistical Manual of Mental Disorders—Fifth Edition* (DSM-V), a GAF score of 70 indicated mild symptoms or some difficulty in social, occupational, and school functioning. Am. Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. rev. 2000).

In terms of pain, Steinborn testified that it hurt both to sit up, sit down, and walk. Steinborn contended that her surgery had done little to relieve this pain. Steinborn testified that her pain was continuous in her lower back, hips, and buttocks. Steinborn testified that she could probably walk about a block-and-a-half before needing to rest due to pain. Steinborn could stand, but not for long, and she would need to slouch and keep shifting due to the pain. She testified that the most comfortable position for her was on the edge of a chair. Additionally, she testified that her migraines occurred two to three times per week and that when one occurred she would need to lie down for the duration of the episode. According to Steinborn, each migraine would last six or seven hours. At the time of the hearing, Steinborn no longer had any issue with left shoulder pain. Steinborn also testified that while she was able to lift a gallon of milk and walk it across a room, doing so was very uncomfortable.

Steinborn further testified as to other aspects of her daily life. Steinborn contended that she had no energy, had problems with focus and attention, and that she cried every day. She also testified that she did not have many friends and that she rarely went anywhere due to her pain and lack of energy. Additionally, Steinborn reported that she frequently would not leave bed or change her clothes. She also testified that she frequently felt a tingling in her neck that "spider-webbed" pain into her arms. Steinborn further testified that for over a year she was having childhood flashbacks stemming from her PTSD.

Steinborn testified that she was on a combination of Methadone[4], Adderall[5], Lexapro[6], and Topamax[7] for her varied ailments. The current medications were helping, but she testified that in the past, dosages did nothing to fully alleviate her pain and symptoms. Steinborn reported that she had good and bad days and that her goal was to get off the medication and "get her life back." The ALJ noted no problems in concentration at the hearing. On the day of the hearing, Steinborn testified that she was having a good day because her husband had put a "jewelry shop" in her basement. However, Steinborn reported that she had not been able to use the shop due to concentration issues. Her testimony then indicated that her husband had set up this basement "jewelry shop" for Steinborn six months earlier. Steinborn testified that the shop remained unused, despite her initial excitement when her husband installed it.

## C.        The ALJ's Opinion

Using its authority granted by the Social Security Act, the SSA has established a five-step sequential process for determining whether an applicant for disability benefits is disabled within the meaning of the Act. *See* 20 C.F.R. § 404.1520(a)(4)(i)–(v). The claimant bears the burden at steps one through four, whereas the burden at step five shifts to the ALJ. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). The ALJ's analysis is sequential and therefore if he determines at any step, other than step three, that the plaintiff is not disabled the analysis ends without proceeding to the next step. *See Smith v. Berryhill*, 2017 WL 4005935 at *2 (S.D. Ill.

---

[4] Methadone is an opioid used to treat people with extreme pain. *What is Methadone?*, WEBMD, https://www.webmd.com/mental-health/addiction/what-is-methadone#1 (last visited March 29, 2018).
[5] Adderall is used to treat attention deficit hyperactivity disorder. *Adderall*, WEBMD, https://www.webmd.com/drugs/2/drug-63163/adderall-oral/details (last visited March 29, 2018).
[6] Lexapro is used to treat depression and anxiety. *Lexapro*, WEBMD, https://www.webmd.com/drugs/2/drug-63990/lexapro-oral/details (last visited March 29, 2018).
[7] Topamax is used to prevent migraine headaches among other things. *Topamax*, WEBMD, https://www.webmd.com/drugs/2/drug-14494-6019/topamax-oral/topiramate-oral/details (last visited March 29, 2018).

Sept. 12, 2017). The ALJ in his March 9, 2015, decision, followed this sequential evaluation process and concluded that Steinborn was not disabled.

At step one, the ALJ concluded that Steinborn's work activity during the relevant period was not "substantial gainful activity." The ALJ at step two found that Steinborn's status-post lumbar fusion with residual, status-post left shoulder arthroscopy with residuals, major depressive disorder, bipolar disorder, PTSD, and ADD constituted severe impairments. However, the ALJ found that Steinborn's history of cervical fusion, neck pain, and headaches did not constitute severe impairments. At step three, the ALJ took into account Steinborn's testimony and her medical records when determining that none of her physical impairments— either singularly or in combination—met or equalled a Listing after applying the "Paragraph B" criteria or the Special Technique.

After determining that no Listing was met, the ALJ determined that Steinborn had a residual functional capacity ("RFC") to perform light work with some additional limitations. Based on a vocational expert's testimony, the ALJ then found that Steinborn could not return to any past relevant work. Looking at Steinborn's age, education, RFC, and work experience, the ALJ determined that she would be able to adjust to other light work. The ALJ then found that significant jobs exist in the national economy that Steinborn could perform, taking into account her limitations. Accordingly, the ALJ found Steinborn to be not disabled.

### D.        Appeals Council Decision

After receiving an unfavorable determination from the ALJ, Steinborn filed a timely appeal to the SSA's Appeals Council. On June 24, 2016, the Appeals Council denied Steinborn's request to review the ALJ's decision. The Appeals Council's decision indicated that "additional evidence," identified as an RFC form dated November 25, 2014, and authored by Dr. DeLeeuw

was considered in reaching its decision to deny Steinborn's appeal.  [DE 8 at 15, 17].  With the Council's denial of Steinborn's appeal, the ALJ's determination became the final decision of the Commissioner.

### III. ANALYSIS

#### A. Standard of Review

The Social Security Act authorizes judicial review of the final decision of the Commissioner and indicates that her factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence is more than a mere scintilla but may be less than the weight of the evidence. *Scheck v. Barnhart*, 357 F.3d 697,699 (7th Cir. 2004). Thus, substantial evidence is simply "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001).

A reviewing court is not to substitute its own opinion for that of the ALJ or to re-weigh the evidence, but the ALJ must build a logical bridge from the evidence to his conclusion. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). Minimally, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the evidence. *See Scott v. Barnhart*, 297 F.3d 589,595 (7th Cir. 2002). The ALJ need not specifically address every piece of evidence in the record, but must present a "logical bridge" tracing the evidence to his conclusions. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010).

#### B. Issues for Review

In this case, Steinborn contends that the ALJ erred in several respects. In regard to her mental functioning, Steinborn argues that the Commissioner erred in three ways. First, Steinborn argues that the ALJ improperly applied "paragraph B" criteria at Step Three when assessing whether Steinborn's severe mental impairments met or medically equalled the severity of a listed impairment ("Listing"). Second, Steinborn asserts that the ALJ erred by failing to give controlling weight to the opinions offered by her treating psychiatrist, Dr. Popli, and her treating psychologist, Dr. Allen, both of whom opined that she was disabled. Third, Steinborn contends that her mental RFC determination is not supported by evidence in the record and therefore is not supported by substantial evidence.

With regard to her physical functioning, Steinborn asserts that the Appeals Council erred in not reviewing, as new and material evidence, Dr. DeLeeuw's Physical RFC Report dated November 25, 2014, which was added to the record after the ALJ issued his decision in March 2015. Steinborn contends that the ALJ's RFC determination that she can perform light work is inconsistent with Dr. DeLeeuw's RFC and that the ALJ's RFC is therefore not supported with substantial evidence.

Lastly, Steinborn asserts that the ALJ erred in determining the intensity and persistence of her subjective symptoms. Steinborn contends that the ALJ failed to apply the new standard for credibility assessments set forth in SSR 16-3p.

## 1.      Step Three Analysis of Paragraph "B" Criteria

In determining whether the severity of a claimant's mental impairments meet or medically equal a Listing at Step Three, the ALJ must consider, among other things, whether the Paragraph B criteria are satisfied thus defining how a particular mental disorder affects a claimant's functioning. 20 C.F.R. § 404.1520a. Under Paragraph B, the ALJ must rate a

claimant's functioning in the four categories of (1) activities of daily living, (2) social functioning, (3) concentration, persistence, or pace, and (4) episodes of decompensation. *Id.* To satisfy the Paragraph B criteria, Steinborn must demonstrate marked restriction in two of the categories, or marked restriction in one area with "repeated" episodes of decompensation. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00. A marked limitation means more than moderate but less than extreme. *Id.*

Here, Steinborn claims that the ALJ erred in his evaluation of her functional limitations due to mental impairments by failing to consider proffered evidence. Specifically, Steinborn contends that the ALJ's conclusions regarding Steinborn's abilities in each of the four paragraph B categories were not supported by substantial evidence. According to Steinborn, the record supports a finding of more than the mild difficulties in social functioning found to exist by the ALJ. Steinborn also argues that the ALJ ignored evidence of Steinborn's deficiencies in concentration that both Dr. Popli and Dr. Allen reported. As such, Steinborn contends that the record supports a finding of more than moderate difficulties in concentration, persistence, and pace. Steinborn also asserts that the ALJ misapplied the law of the Seventh Circuit with regard to decompensation. Lastly, Steinborn argues that the ALJ ignored aspects of her home life that supported more than the ALJ's finding of mild restriction in activities of daily living.

### a. Activities of Daily Living

Despite Steinborn's argument to the contrary, the ALJ's conclusion that her impairments resulted in mild restriction in activities of daily living is supported by substantial evidence. In support of his finding, the ALJ explicitly cited evidence in the record demonstrating that Steinborn had performed light chores, went to the store once a month, and exercised her back. In addition, he relied upon Steinborn's own testimony reporting that she only had some issue taking

care of personal needs. Steinborn asks this Court to find the mild restriction inconsistent with the record, but presents nothing to suggest that the ALJ could or should find that she suffered from marked limitations in her activities of daily living. Arguably there is evidence in the record showing that Steinborn performed a varied range of activities of daily living. This alone, however, is not sufficient to persuade the Court that the finding of mild restriction was not supported by substantial evidence or was an error of law.

### b. Social Functioning

On the social functioning prong, the ALJ also found that Steinborn suffered from mild limitations. Steinborn alleges that this rating was the result of the ALJ ignoring her testimony that she had no friends and an overemphasis on GAF scores. Nevertheless, the Court finds that the ALJ supported his "mild difficulties" finding with substantial evidence. For instance, the ALJ pointed to both of Steinborn's treating physicians who rated her as having only slight limitations in this area, and the State agency doctors who opined that she had a mild restriction. Additionally, the ALJ cited to Steinborn's own testimony that she did not have issues in social functioning and that she did not have issues getting along with others as further evidence to support his conclusion of a mild limitation in social functioning. Based on this evidence, the ALJ built a logical bridge between his conclusion that Steinborn only suffered mild limitations in social functioning and the record.

### c. Concentration, Persistence, and Pace

In terms of concentration, persistence, and pace, the ALJ found moderate difficulties. Again the ALJ's decision here is backed by substantial evidence. The ALJ cites Dr. Popli's and Dr. Allen's opinions that Steinborn frequently had difficulty with concentration, while the State agency psychologists found no limitation. The ALJ also cited to Dr. Popli's notes that showed

normal thought processes. Additionally, the ALJ discussed that Dr. Allen found her to have an average attention and intact memory. Lastly, the ALJ relied upon Steinborn's own testimony at the hearing that she did not have trouble concentrating. Yet the ALJ also found the state agency psychologist's opinion that Steinborn had no limitations related to concentration, persistence, and pace was inconsistent with the record. Instead, he found that the evidence showed a moderate limitation in concentration, persistence, and pace. As such, the ALJ's finding is supported by substantial evidence.

### d. Episodes of Decompensation

Lastly, turning to episodes of decompensation, the ALJ found no evidence of any decompensation during the relevant period. Steinborn, however, argues that an increase in symptoms is evidence of decompensation, especially when accompanied by changes to medication and fluctuations in mood. In support, Steinborn relies upon *Natale v. Comm'r of Soc. Sec.,* 651 F.Supp.2d 434, 451–53 (W.D. Pa. 2009), which held that it was error for an ALJ to find no episodes of decompensation where there was evidence of a history of adjustments to medication or fluctuations in mood. *See also* 3 Social Security Law & Practice § 42:124 (2010). The Court is persuaded by Steinborn's argument that the ALJ did not adequately assess this category of Paragraph B criteria. While the ALJ need not discuss all evidence, he must create a logical bridge as to the evidence and the ultimate result. *See Haynes,* 416 F.3d at 626. There has been no logical bridge made here, as the ALJ has not addressed the changes in dosage and fluctuations in mood as indicated by GAF scores. Additionally, Dr. Allen and Dr. Popli opined in their reports that there were several episodes of decompensation. The ALJ focused upon the lack of hospitalization alone and has not accounted for entire portions of the record that could amount

to episodes of decompensation. Therefore, the ALJ has not supported his conclusion that Steinborn suffered no relevant episodes of decompensation with substantial evidence.

Nevertheless, remand for further consideration of the Paragraph B criteria is not necessary because a change in the decompensation analysis—even if in favor of Steinborn—would not change the Step Three outcome. The ALJ supported his findings of mild or moderate difficulties in concertation, persistence, and pace; social functioning; and activities of daily living with substantial evidence. As such, the ALJ's failure to find any marked limitation in Steinborn's abilities related to the Paragraph B categories is also supported by substantial evidence. Therefore, the error in decompensation analysis is harmless and would not, by itself, require remand.

## 2. Steinborn's RFC

If a person is not found to be disabled at Step Three, the ALJ will then make a finding as to the claimant's RFC before moving on to Step Four. *See* 20 C.F.R. § 404.1520(a)(4)(iii)–(iv). The Commissioner defines a person's RFC as "the most you can still do despite your limitations." 20 C.F.R. § 404.1545(a)(1). All impairments at this stage are taken into account, not just those that have been previously determined to be severe. 20 C.F.R. § 404.1545(a)(2). In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the case record. 20 C.F.R. § 404.1512(c). However, the claimant retains the burden to provide the ALJ with medical evidence showing how her impairments affect her functioning. 20 C.F.R. § 404.1545.

In this case, the ALJ found, "[a]fter careful consideration of the entire record," that Steinborn

> has the [RFC] to perform light work as defined in 20 C.F.R. § 404.1567(b) except that [Steinborn] can never climb ladders, ropes or scaffolds but can occasionally

climb ramps and stairs; and occasionally balance, stoop, kneel, crouch, and crawl. The claimant can frequently finger. The claimant is limited to simple, routine, and repetitive tasks; and work that does not involve quotas.

[DE 8 at 36]. The Court now addresses Steinborn's concerns about the weight given to opinion evidence, the evidence used to support the ALJ's determination of her mental and physical RFCs, the ALJ's subjective symptom analysis, and the Appeals Council's alleged failure to consider new and material evidence in reaching its conclusion about Steinborn's RFC.

### a. Weight Given to Opinion Evidence

Steinborn asserts that the ALJ erred in making his RFC determination because he did not afford the proper weight to the opinions of her treating psychiatrist, Dr. Popli, and her treating psychologist, Dr. Allen. Specifically, Steinborn contends that the ALJ failed to articulate good reasons for discounting her mental health professionals' opinions.

"[I]n determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003) (citing 20 C.F.R. § 404.1527(d)(2)). A treating physician's opinion is entitled to controlling weight when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is consistent with other substantial evidence in the record. *Israel v. Colvin*, 840 F.3d 432, 437 (7th Cir. 2016). In general, a treating physician is better positioned to evaluate a claimant's limitations than a non-treating source due to his or her "greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). If a "treating physician's opinion is consistent with the relevant treatment notes and claimant's testimony, it should form the basis for the ALJ's determination." *Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013).

Nevertheless, an ALJ is not required to "blindly accept" a treating physician's opinion and "may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons" for doing so. *Schreiber v. Colvin*, 519 F. App'x 951, 958 (7th Cir. 2013) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)). In other words, an ALJ can discount a treating physician's opinion but "good reasons" must be proffered for doing so. *Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014); 20 C.F.R. § 404.1527(c)(1). When discounting a treating physician's opinion, however, the ALJ must consider factors delineated in the Social Security regulations including (1) the examining relationship between the physician and the claimant; (2) the length and nature of the treating relationship; (3) the scope of relevant and supportive evidence presented by the physician; (4) the consistency of the opinion with the record as a whole; (5) the physician's specialization; and other factors raised by the claimant. 20 C.F.R. 404.1527(c). In the end, a court must uphold any reason for discounting a treating physician's opinion except for the "most patently erroneous." *See Gudgel*, 345 F.3d at 470; *Luster v. Astrue*, 358 F. App'x 738, 740 (7th Cir. 2010).

### i. Dr. Popli's Opinion

As discussed above, Dr. Popli treated Steinborn for her ADD and Bipolar Disorder from 2012 through 2014 as relevant here. The ALJ gave only some weight to Dr. Popli's opinions citing his Medical Source Statement opining that Steinborn (1) "would miss three or more days of work a month;" (2) "had marked loss in carrying out detailed instructions and maintaining regular attendance;" (3) "had n[o] to mild loss following simple instructions;" and (4) "had no limitation in her social functioning." [DE 8 at 42]. Steinborn argues that the ALJ improperly discounted Dr. Popli's opinion by relying too heavily upon GAF scores; misunderstanding the

fluctuating and episodic nature of bipolar disorder; rejecting Dr. Popli's opinion that Steinborn's impairments would cause excessive absenteeism; failing to consider the fact that Dr. Popli satisfied all the mandatory regulatory factors; and failing to identify clearly which aspects of Dr. Popli's opinion were discounted. Steinborn's arguments, however, are not persuasive.

Steinborn correctly notes that in the ALJ's paragraph assigning weight to Dr. Popli's opinion, the ALJ explicitly referenced Dr. Popli's report that Steinborn's GAF score was 55 at one point in time. [DE 8 at 42]. Steinborn is also correct that GAF scores are simply momentary "snapshots" of a claimant's functioning that cannot be used to assess overall functioning. *See Pontarelli v. Colvin*, 13 C 1015, 2014 WL 3056616, at *8 (N.D. Ill. July 7, 2014). Indeed, fluctuating GAF scores are the hallmark of bipolar disorder as patients will have both periods of depression and mania. *See Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) (noting that claimants with bipolar disorder are "likely to have better days and worse days.").Yet Steinborn ignores other parts of the ALJ's opinion that address a broader range of evidence.

First, the ALJ explicitly and thoroughly discussed Steinborn's fluctuating range of GAF scores along with her fluctuating symptoms from 2012 through 2014 by citing Dr. Popli's treatment notes in a separate paragraph. [DE 8 at 39–40]. Second, the ALJ compared Dr. Popli's opinions to other evidence in the record including that of Dr. Allen and the State agency consultative psychologists as well as Steinborn's own testimony before determining that they were inconsistent with each other. In so doing, the ALJ has not presented any patently erroneous reason for discounting Dr. Popli's opinion. In fact, the ALJ favored aspects of Dr. Popli's opinion over others.

The ALJ's decision did not focus on one of Steinborn's better days alone in discounting Dr. Popli's opinion either. He directly pointed to inconsistencies between Dr. Popli's treatment

notes, as well as other evidence in the record, and his opinion that Steinborn had marked restrictions in certain categories of function. *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). As to the regulatory factors, the ALJ may not have explicitly referenced every factor in his decision. To the extent this may be deemed error, it is harmless because the ALJ supported his decision to discount the weight of Dr. Popli's opinion with substantial evidence. Therefore, the ALJ articulated "good reasons" for discounting Dr. Popli's opinion and remand is not warranted on this issue alone. *See Moore*, 743 F.3d at 1127.

### ii. Dr. Allen's Opinion

Steinborn began treatment with Dr. Allen, a psychologist, in 2012 seeking marital counseling. As Steinborn's therapist, Dr. Allen also diagnosed her with depression and PTSD. He did not treat her much in 2013, but she returned in 2014. Dr. Allen then prepared a Medical Source Statement in which he opined that she (1) "would miss 3 or more days of work;" (2) "had marked limitations in following any instructions;" and (3) "had social issues because of her mental impairments." [DE 8 at 42]. The ALJ gave only little weight to Dr. Allen's opinion finding it inconsistent with the record. In support, the ALJ cited Dr. Allen's Medical Source Statement, the break in Steinborn's treatment with Dr. Allen, the range of GAF scores reported by Dr. Allen between 2012 and 2014, and Steinborn's own testimony that she could pay attention, follow instructions, and get along with others along with her failure to mention any social issues at the hearing. [DE 8 at 42].

Steinborn contends that again, the ALJ not only focused incorrectly on GAF scores, but also selectively ignored evidence from Dr. Allen that was favorable to her. Specifically, she argues that whole portions of the record relating to her social functioning were not discussed or considered by the ALJ. Those omitted portions, Steinborn argues, demonstrate that she had

difficulty focusing during appointments, pressured speech, and tangential thoughts, as well as that she often came late to appointments with a tearful and distraught demeanor. Arguing that this evidence supports a finding of limited social functioning, Steinborn contends that the ALJ's determination that there was no evidence of social issues is not supported by substantial evidence in the record.

Here, the ALJ's analysis fails to articulate "good reasons" for discounting Dr. Allen's medical opinions. *See Moore*, 743 F.3d at 1127. In explaining the weight given to Dr. Allen's opinion, the ALJ focused on the limited role Dr. Allen played in Steinborn's mental health care. The ALJ noted that Steinborn only sought Dr. Allen for marriage counseling and that he opined about her symptoms on the days when he treated her attributing them only to her marital discord. Yet in weighing Dr. Allen's opinions, the ALJ failed to account for symptoms and diagnoses reported by Dr. Allen and cited earlier in his decision. [*See* DE 8 at 40]. In so doing, the ALJ not only fails to articulate good reasons for discounting Dr. Allen's opinion to the extent he did, but also appears to have filled an evidentiary gap based on his own judgment.

An ALJ is not a doctor and must not substitute his medical judgment for that of the treating physician. *Suide v. Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010) (the ALJ must not "play doctor" by using his own lay opinions). Accordingly, it was not permissible for the ALJ to come to a conclusion about the causes of Steinborn's symptoms in Dr. Allen's office. Moreover, review of evidence from Dr. Allen suggests that he actually attributed Steinborn's symptoms to her bipolar depression and PTSD, not just marital discord.

The ALJ, also, failed to account for Dr. Allen's observations that Steinborn exhibited pressured speech, anxiety, and a tearful and distraught disposition when discounting his opinion about Steinborn's functionality. While the ALJ was not required to discuss every piece of

evidence, his lack of discussion of reasons for discounting evidence favorable to Steinborn within Dr. Allen's records, especially related to her social functioning, warrants remand. *See O'Connor-Spinner, 627 F.3d at 618.* The ALJ did not discuss entire portions of Dr. Allen's medical opinion. Thus, remand is necessary so that the ALJ can build a logical bridge between Steinborn's proffered evidence and his decision to give little weight to Dr. Allen's opinion.

### b. The Mental RFC Determination

Steinborn also contends that the mental RFC found by the ALJ is not supported by substantial evidence. As discussed above, however, the ALJ generally cited to a range of evidence showing the fluctuating nature of Steinborn's symptoms consistent with her bipolar diagnoses. *See Bauer, 532 F.3d at 609.* The ALJ also assessed the entire record and found inconsistencies that supported his mental RFC determination. Specifically, the ALJ found that the recommendations for more severe restrictions by Steinborn's doctors did not comport with their own treatment notes and observations on her mental functioning. The ALJ noted that even on days in which Steinborn's symptoms were noted to be worsening, Steinborn's doctors still reported that she had intact thought processes, concentration, and good insight. Additionally, the ALJ discounted the non-treating physician's opinion that Steinborn had no limitations as inconsistent with the record. With the support of this evidence, the ALJ crafted a middle-ground RFC statement to better reflect the record as a whole rather than blindly accepting what he explained to be inconsistencies in the proffered evidence.

However, the ALJ's finding that Steinborn would not miss work due to her mental limitations is not so clearly supported by the evidence in the record. For instance, both Steinborn's psychiatrist and psychologist concluded that she will miss work due to her mental limitations and noted that she had been late to appointments. The ALJ appears to discount their

opinions on her expected absenteeism as related solely to her marital issues and flashbacks. Putting aside that the flashbacks are arguably a symptom of her documented PTSD and that marital discord could be a cause of heightening depression, the ALJ offers nothing to account for Steinborn's documented history of being tardy to appointments and not leaving the house for days on end. Additionally, the ALJ's reliance on the testimony of Steinborn's husband to bolster his conclusion that only marital discord caused her worsening mental health symptoms does not explain why the evidence of tardiness and missed therapy sessions should be ignored. Without more, the ALJ has not articulated reasons why such evidence should be discounted in light of the entire record. *See Scott*, 297 F.3d at 595. Instead, the ALJ appears to have relied on his own lay opinions about Steinborn's risk of excessive absenteeism rather than the medical evidence in the record. *See Suide*, 371 Fed. App'x at 690. This error necessitates remand.

### c.    The Physical RFC Determination

Steinborn also challenges the ALJ's determination that Steinborn was limited physically to light work[8] with no climbing of ladders, ropes or scaffolds; occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps and stairs; and frequent fingering.  [DE 8 at 36].  Specifically, Steinborn argues that the record includes evidence regarding her severe back impairment and her non-severe neck and headache impairments that is inconsistent with the ALJ's light work RFC.

---

[8] Pursuant to 20 C.F.R. § 404.1567,

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

As to Steinborn's migraine headaches, the ALJ does not discuss them in his RFC analysis. The ALJ only mentioned the headaches in his Step Two analysis finding them non-severe. In support of his conclusion, the ALJ merely stated that "the claimant had only intermittent complaints [of headaches] with no specific treatment for it." [DE 8 at 34]. While the ALJ is not required to explain each piece of evidence in assessing a claimant's RFC, he is still required to provide a logical bridge between his conclusion and all the evidence in the record, including evidence of any non-severe impairments and the claimant's own testimony. *See Haynes*, 416 F.3d at 626; 20 C.F.R. § 404.1545(a)(2). Nevertheless, Steinborn retains the burden to provide the ALJ with medical evidence showing how her impairments affect her functioning. *See* 20 C.F.R. § 404.1545; *see also* 42 U.S.C. § 423(d)(5)(A) (requiring claimant to "furnish such medical and other evidence of the existence" of disability); 20 C.F.R. § 1512(a) (requiring claimant to "furnish medical and other evidence [to be used] to reach conclusions about [the claimant's] medical impairment(s)").

Thus, the Commissioner argues that the ALJ properly found Steinborn's headaches were not severe. What the Commissioner misses, however, is that the ALJ was still required to consider all the evidence in the record in assessing Steinborn's RFC. On this count, the ALJ failed. The record arguably included evidence indicating that Steinborn was treated for her headaches. For instance, the record shows that Steinborn was given Torodol injections and several other medications for her headaches; that she complained of these headaches to her doctors; and that she testified as to having migraines two to three times per week. The ALJ's decision neither accounts for this evidence nor explains why this evidence has no effect on Steinborn's RFC. As such, the ALJ has failed to articulate the necessary logical bridge between

the evidence of Steinborn's headaches and her RFC at best.  At worst, the ALJ erred by ignoring evidence in the record.  Either way, remand is necessary.

Similarly, the ALJ fails to support his light work RFC with substantial evidence in light of her range of motion loss related to her cervical spine issues and her back pain.  In reaching his conclusion, the ALJ acknowledges Steinborn's alleged range of motion limitations identified by her doctors, but emphasizes that they are at odds with Steinborn's own testimony. Specifically, the ALJ cites Steinborn's testimony that lifts weights at home, joined a gym, goes on walks, has a jewelry shop in the basement, and goes on recreational trips to support that Steinborn had a wider range of motion than the medical reports indicated. The ALJ, however, has failed to explain how some of these activities establish only a slight limitation in her range in motion as reflected in the RFC.

Indeed, the weight lifting and walking were likely part of the physical therapy prescribed to help improve her condition. While Steinborn's two recreational trips, one of which included scuba diving, make create an inference about her range of motion, the ALJ did not articulate how the trips trumped medical opinions in the record finding that she had limited range of motion. The ALJ also has not cited evidence connecting Steinborn's limited use of her jewelry shop to an increased range of motion.  Once again, the ALJ appears to have selectively chosen evidence rather than weighing the full range of proffered evidence to reach his conclusion about Steinborn's physical RFC.  Thus, remand is required so that he may adequately assess the record in its entirety in determining "the most [Steinborn] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1).

### d.     Subjective Symptom Analysis

In determining a claimant's limitations when creating an RFC, the ALJs use a two-step process, as promulgated by the Commissioner, for evaluating a claimant's subjective symptoms. *See* SSR 96-7p; SSR 16-3p. At step one the ALJ will determine if the claimant has an impairment that can reasonably cause the alleged symptoms. SSR 16-3p. Then at step two the ALJ will evaluate the intensity and persistence of symptoms and determine the extent to which these limit the claimant's ability to engage in work-related activities. *Id.* Factual determinations by the ALJ are afforded "special deference." *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010). Indeed, the credibility determination need not be "flawless" as long as enough of the ALJ's reasons are valid. *Halsell v. Astrue,* 357 F. App'x 717, 723 (7th Cir. 2009). Ultimately, however, an error of law warrants reversal "irrespective of the volume of evidence supporting factual findings." *Schmoll v. Harris,* 636 F.2d 1146, 1150 (7th Cir. 1980).

Steinborn contends that the ALJ applied the incorrect legal standard in assessing her subjective symptoms, necessitating a remand. As part of his opinion, the ALJ conducted a credibility analysis under SSR 96-7. At the time of the ALJ's decision, SSR 96-7 provided the most current guidance from the Commissioner to the ALJs on how best to evaluate a claimant's subjective symptoms. In 2016, however, the SSA issued SSR 16-3p, which clarified the second step of the two-part process mandated in SSR 96-7p. *See Mendenhall v. Colvin,* 2016 WL 4250214 at *3 (C.D. Ill. Aug. 9, 2016). SSR 16-3p, however, did not change existing law. *Id.* The new ruling removed the term "credibility" and clarified that the "subjective symptom evaluation is not an examination of an individual's character." *Id.* (quoting SSR 16-3p).

Here, the SSR 16-3p analysis may or may not change the ultimate outcome of the ALJ's disability determination. Nevertheless, a new rule applies retroactively when it merely clarifies

without making a substantive change to SSA policy or law. *See Pope v. Shalala*, 998 F.2d 473, 482-83 (7th Cir. 1993), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999). Therefore, Steinborn is entitled to a remand to allow for the application of the legal standard set forth in SSR 16-3p.

### 3.    New and Material Evidence Before the Appeals Council

Lastly, Steinborn claims that the Commissioner failed to consider new and material evidence that was submitted to the Appeals Council after the ALJ hearing. Specifically, Steinborn requests a remand so that the ALJ can consider a report written by Dr. DeLeeuw on November 25, 2014, opining that her spinal issues had not improved enough to allow her to perform light work.

The Appeals Council uses a two-part test to determine if new evidence should be considered. *See* 42 U.S.C. § 405(g); *Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir. 1997) (citing 20 C.F.R. § 404.970(b)). The threshold requirement for review is that the submitted evidence be new, material, and relevant to the adjudicated period. 20 C.F.R. § 404.970(b). If the evidence meets this threshold standard, then the Appeals Council looks to the entire augmented record to determine if the ALJ's decision is contrary to the weight of the evidence. *See Perkins*, 107 F.3d at 1290. Steinborn argues that Dr. Leeuw's report is new evidence because it was not before the ALJ when he rendered his opinion and is material to the outcome of the case because it demonstrates that she cannot do light work, which could result in a disability finding given her age and the applicability of the Grid Rules.  Despite Steinborn's arguments, the Court is not persuaded that Dr. Leeuw's November 2014 report constitutes new and material evidence.

Evidence is new when it was "not in existence or available to the claimant at the time of the administrative proceeding." *Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993). The

ALJ issued his Steinborn decision on March 9, 2015. Therefore, Dr. DeLeeuw's assessment dated November 25, 2014, was available to Steinborn and could have been submitted before the ALJ rendered his opinion more than three months later. Moreover, Steinborn offers no explanation why she did not submit Dr. Leeuw's report promptly after it was produced in November 2014.

Evidence is material if "there is a 'reasonable probability' that the Commissioner would have reached a different conclusion had the evidence been considered." *Perkins*, 107 F.3d at 1296. In his November 2014 report, however, Dr. Leeuw opined that Steinborn could lift more than 50 pounds, sit more than six hours, and generally engage in greater postural activities than previously indicated—limitations that the ALJ included in Steinborn's RFC. Thus, the Court sees no reasonable probability that consideration of the assessment would have changed the record.

Additionally, Steinborn argues that the language used by the Appeals Council in rejecting her appeal mirrors that in *Farrell v. Astrue*, 692 F.3d 767, 772 (7th Cir. 2012), which necessitated remand. In discussing Dr. Leeuw's November 2014 report, the Appeals Council stated

> In looking at your case, we considered . . . the additional evidence . . . . We considered whether the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence of record. We concluded that the additional evidence does not provide a basis for changing the [ALJ's] decision.

[DE 8 at 15]. In *Farrell*, the Appeals Council had rejected the claimant's appeal after considering additional evidence from a doctor and finding that the "information does not provide a basis for changing the [ALJ] decision." 692 F.3d at 771. After determining that the additional evidence was new and material, the *Farrell* court rejected the Commissioner's argument in support of the general language in the Appeals Council's decision and remanded the case for consideration of the additional evidence.

Here, Steinborn contends that the ALJ's very use of the same language that was rejected in *Farrell* necessitates remand on the issue of "new and material evidence." However, *Farrell* does not stand for a proposition of an automatic remand. The court in *Farrell* clearly recognized that this language is common in Appeals Council decision and noted its ambiguity. *Id.* At 771. However, the court only remanded after determining that the additional evidence in that case was indeed "new" and "material" as required under the relevant regulation. *Id.* at 771–72. In Steinborn's case, the language used by the Appeals Council may be similarly ambiguous. Yet a remand on this issue would not change the outcome for Steinborn because she has failed to meet the threshold requirement of showing that Dr. Leeuw's report, proffered after the ALJ rendered his decision, is new and material.

IV. **CONCLUSION**

For the reasons set forth above, the Court finds that the ALJ's RFC determination is not supported by substantial evidence. Therefore, the decision of the Commissioner is **REVERSED** and the case is **REMANDED** to the Social Security Administration for further proceedings consistent with this Opinion and Order. The Clerk is **DIRECTED** to terminate the case.

**SO ORDERED.**

Dated this 30th day of March 2018.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge